PRESENT: Lemons, C.J., Goodwyn, Mims, Powell, Kelsey, and McCullough, JJ., and Millette, S.J.

JUDICIAL INQUIRY AND REVIEW COMMISSION OF VIRGINIA

v. Record No. 170889

OPINION BY
CHIEF JUSTICE DONALD W. LEMONS
November 27, 2017

KURT J. POMRENKE, JUDGE OF THE TWENTY-EIGHTH
JUVENILE AND DOMESTIC RELATIONS JUDICIAL DISTRICT

The Judicial Inquiry and Review Commission of Virginia (the "Commission") filed the present complaint against Kurt J. Pomrenke ("Judge Pomrenke"), pursuant to the original jurisdiction of this Court set forth in Article VI, Section 10 of the Constitution of Virginia and Code § 17.1-902. The Commission asserted that its charges against Judge Pomrenke for allegedly violating the Canons of Judicial Conduct for the Commonwealth of Virginia (the "Canons"), as set out in Part 6, Section III of the Rules of the Supreme Court of Virginia, are well founded in fact, and that the violations are of sufficient gravity to require that this Court censure or remove him from office.

I. Facts and Proceedings

A. The Notice

On January 17, 2017, the Commission issued a Notice establishing formal charges ("Notice") against Judge Pomrenke, alleging that he had engaged in misconduct and conduct prejudicial to the proper administration of justice while serving as a juvenile and domestic relations district court judge. He was charged with violations of Canons 1, 2A, and 2B.

The Commission based its charges on certain alleged facts related to the criminal corruption trial of his wife. Judge Pomrenke's wife, Stacey Pomrenke, was an executive vice

president and the chief financial officer of the Bristol Virginia Utilities Authority ("BVU") and was indicted by a federal grand jury on 15 corruption charges on October 26, 2015. According to the Notice, Judge Pomrenke attempted to influence two potential witnesses in his wife's criminal trial.

**Note to Donald L. Bowman**

Judge Pomrenke sent a handwritten note to his wife's boss, BVU president and chief executive officer Donald L. Bowman ("Bowman"), on November 18, 2015, that stated as follows:

> Hi Don,
> I just wanted to sincerely thank you for your kindness and understanding support for Stacey during these horrible times. By now I am sure you would agree she is absolutely honest, truthful, ethical, and innocent! It is horrible what our government is doing to her. She will be proven innocent. Thank you for believing in her.
> Kurt Pomrenke

Judge Pomrenke included one of his business cards identifying himself as a judge with this note.

**Voicemail for Connie Moffatt**

The second allegation involved a voicemail message Judge Pomrenke left on February 13, 2016, for Connie Moffatt ("Moffatt"), a BVU employee who was expected to testify during his wife's trial on February 16, 2016. The message stated:

> Hey Connie, this is Kurt, um, when you're testifying in that trial there might be a couple of things that you could do that would really help Stacey. If you could kinda slip in when you have a chance just little remarks like, how Stacey did a great job, or Stacey was the one that took care of the employees, or Stacey is just an honest . . . just any, any kind of little comments you can make to support her or, Stacey was the one that always looked out for the employees or, just . . . just something like that even though it's not directly in response to the questions, if you could figure out a way to, to do that I really think that would help and make a huge difference. I'm sorry you're caught up in this, but we feel really

2

good about the outcome and sure appreciate your help. Thank you, bye.

On February 26, 2016, Mrs. Pomrenke was found guilty of 14 of the 15 corruption charges. Three days later, the federal district court judge directed the government to bring a contempt prosecution against Mrs. Pomrenke, based in part on the note to Bowman. The charge was later supplemented to include the message left for Moffatt as well. While her contempt prosecution was pending, a federal magistrate judge presided over a search warrant hearing during which the prosecutor presented evidence of the Bowman note and Moffatt voicemail. The magistrate judge stated that, if the evidence were true, it would establish probable cause that Judge Pomrenke had engaged in witness tampering and/or obstruction of justice. Mrs. Pomrenke was later found guilty of contempt. Upon finding her guilty, the federal district court judge noted in open court that Judge Pomrenke's actions were not proper, but they were not before him for adjudication.

## B. Judge Pomrenke's Answer

Judge Pomrenke filed an answer to the Commission's charges on February 8, 2017. Judge Pomrenke argued that the alleged actions did not amount to judicial misconduct or conduct prejudicial to the proper administration of justice, and he asserted that his actions did not violate any Canons of Judicial Conduct. He admitted sending the note to Bowman and leaving the voicemail for Moffatt. However, he stated that when he sent the note to Bowman he did not know that Bowman was a potential witness for the government. He asserted that he made both of these communications in his personal capacity and was not intending to intimidate or pressure anyone. He nonetheless agreed that in hindsight he would not again make such a call or write such a note.

## C. The Commission Hearing

The Commission conducted an evidentiary hearing on June 13, 2017, at which time Judge Pomrenke was present and represented by counsel. Bowman testified that he is an attorney licensed in Virginia, and he was hired as the president and chief executive officer of BVU in November 2014. Mrs. Pomrenke was the chief financial officer when he came to work there. When Bowman began his employment at BVU, he was aware that federal authorities were investigating allegations of corruption at BVU. Bowman began assisting the authorities in their investigation in February of 2015. Bowman testified in trials against at least two other former BVU employees in the period after he was hired and before Mrs. Pomrenke was indicted.

Bowman testified that Mrs. Pomrenke was indicted on October 26, 2016, and that shortly thereafter he received the note from Judge Pomrenke. Bowman stated that after he read the note, he was shocked. He immediately got in his car and drove to Abingdon to meet with the U.S. Attorney and show him the note. Bowman testified that at the time he received the note from Judge Pomrenke, the U.S. Attorney had already indicated that Bowman would be a witness in Mrs. Pomrenke's trial. Bowman did not know if Mrs. Pomrenke was aware of that at the time of her indictment.

Ultimately, Bowman did not testify at Mrs. Pomrenke's trial. His name, however, was filed on the witness list on February 5, 2016, several months after he received the note from Judge Pomrenke. Bowman was also aware of the federal court's instructions to Mrs. Pomrenke not to contact potential witnesses. Bowman explained that he was shocked for several reasons when he received Judge Pomrenke's note. He thought it was unusual to get a card from an employee's spouse in general, but he was very disturbed by the contents of the card and the fact

4

that Judge Pomrenke's judicial business card was attached.  Bowman also testified before the Commission that he did not think Mrs. Pomrenke was honest or particularly hard-working, and he didn't think she would be found innocent.  Bowman further stated that, as a military veteran, he "was most offended by the statement it is horrible what the government is doing to them." Bowman testified that although the note would not have changed his testimony if he had testified in Mrs. Pomrenke's trial, he was still troubled by the note.  He explained that Judge Pomrenke was a former member of the BVU Board, he had a lot of powerful political influence in the community, and he "certainly wouldn't want to make Judge Pomrenke mad."

Edward Stout testified as a character witness for Judge Pomrenke, and stated that Judge Pomrenke was honest, hard-working, optimistic, and very active in the community.  He also stated that Judge Pomrenke was "the most prodigious note writer I have ever known."  Ray Ferris, another character witness, testified that Judge Pomrenke was a very loyal, honest, caring, and loving individual.  Ferris stated that Judge Pomrenke always thought the best of people. Ferris testified that Judge Pomrenke was truly remorseful about his actions, and he believed that Judge Pomrenke's judgment was simply clouded by his emotions and his desire to help his wife.

Judge Pomrenke admitted before the Commission that he never thought about the Canons when he sent the note to Bowman or left the message for Moffatt; rather, he was acting as a husband who felt helpless.  He stated that he has come to "realize and appreciate that what I did was just dead wrong, absolutely wrong," and he understood how it conveyed the wrong message to Bowman and to other people in the community.  He stated that, even though Moffatt was a close friend, she was a potential witness and he should not have done what he did.  He then apologized to the Commission for his actions.

5

Judge Pomrenke explained that his wife's trial was a huge financial hardship, and they were grateful that Bowman allowed her to continue working after her indictment. He also stated that Bowman was supportive, pleasant, and professional to his wife during this time, and Judge Pomrenke was thankful for that, which is why he sent the card. He testified that he has always been a note writer. When he was a lawyer he always included his business card with any notes he sent, and when he became a judge he continued that practice. He testified that he now understood the problem with that practice and has stopped doing so. Judge Pomrenke testified that he sent the note as a husband, that he never thought Bowman would be a witness, he was not trying to affect him, and he never considered that Bowman might "take it wrong as coming from a judge."

Regarding the voicemail he left for Moffatt, Judge Pomrenke testified that he now understood he never should have left her such a message or suggest how she should testify. He explained that Moffatt was a close personal friend, and when he called her, he was just thinking as a husband about ways to help his wife. Judge Pomrenke testified that he thought Moffatt believed and agreed with everything he said in the message.

Judge Pomrenke testified that he recognized the errors he made. He stated that he was truly sorry, his actions were wrong, and he promised the Commission it would never happen again. He admitted that in his first communications with the Commission, he had argued that his actions did not violate the Canons, but he had come to realize they did. He agreed that his actions violated Canons 1, 2A and 2B. Judge Pomrenke also admitted that he attended his wife's bond hearing and heard the instruction to his wife from the judge that she was not to communicate with any potential witnesses. He further admitted that, as a judge, he is very familiar with that "normal condition of bond."

6

At the conclusion of the hearing, the Commission unanimously found the charges that Judge Pomrenke had violated Canons 1, 2A and 2B were "well-founded and of sufficient gravity to constitute the basis for retirement, censure, or removal." The Commission concluded that a formal complaint should be filed in the Supreme Court of Virginia. A formal complaint was filed with this Court on July 10, 2017.

## II. Analysis

The filing of a formal complaint by the Commission triggered this Court's duty to conduct a hearing to determine whether Judge Pomrenke "engaged in misconduct while in office, or . . . has engaged in conduct prejudicial to the proper administration of justice." Va. Const. art. VI, § 10. We have explained that:

> In conducting the hearing on the formal complaint filed by the Commission, this Court considers the evidence and makes factual determinations de novo. The Commission must prove its charges in this Court by clear and convincing evidence. The term "clear and convincing evidence" has been defined as "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases. It does not mean clear and unequivocal."

*Judicial Inquiry & Review Comm'n v. Waymack*, 284 Va. 527, 534-35, 745 S.E.2d 410, 414 (2012) (citation omitted). Further, this Court does not accord any particular weight or deference to factual determinations, findings and opinions of the Commission. *Id.* If after conducting an independent review of the record and hearing argument of counsel, we find clear and convincing evidence that a judge's actions or conduct violated the Canons, and that the judge's actions were of sufficient gravity to constitute misconduct while in office, persistent failure to perform the duties of the office, or conduct prejudicial to the proper administration of justice, we shall

7

censure or remove the judge from office.  *Id.* at 535, 745 S.E.2d at 414; *see also Judicial Inquiry & Review Comm'n v. Peatross*, 269 Va. 428, 450, 611 S.E.2d 392, 404 (2005).

### A.  Canons 1 and 2

Judge Pomrenke was charged with violating Canons 1, 2A and 2B.  Canon 1 states:

> A Judge Should Uphold the Integrity and Independence of the Judiciary.
>
> A. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of these Canons are to be construed and applied to further that objective.

Canon 2 states in relevant part:

> A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities.
>
> A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
>
> B. A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify as a character witness.

The Commission's complaint states that it found the charges based on violations of Canons 1, 2A, and 2B to be well-founded.  Judge Pomrenke conceded at the Commission hearing that his actions were wrong and violated these Canons, and he makes the same concession before this Court.  Based upon the record before us, including the admissions of

Judge Pomrenke, we conclude the Commission has met its burden of proving by clear and convincing evidence that Judge Pomrenke committed the violations of the Canons charged in the Notice.

## B. Disposition

Judge Pomrenke violated the Canons by his conduct because his actions failed to uphold the integrity and independence of the judiciary, and tended to impair public confidence in the integrity and impartiality of the judiciary. *See* Canons 1 and 2. The Commission did not make a recommendation to this Court regarding the appropriate sanction for Judge Pomrenke based upon these violations.

The preamble and commentary to the Canons of Judicial Conduct provide as follows:

> Our legal system is based on the principle that an independent, fair, and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all sections of the Canons are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law.

Va. Sup. Ct. R., Part 6, § III, Preamble.

> Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges. . . . Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility. Conversely, violation of this Canon diminishes public confidence in the judiciary and thereby does injury to the system of government under the law.

Va. Sup. Ct. R., Part 6, § III, Canon 1, cmt.

9

We conclude that Judge Pomrenke's violations of the Canons were grave and substantial. Judge Pomrenke made a deliberate decision to contact two potential witnesses prior to his wife's trial. We agree with the observations made by the Commission in its brief,

> At the time he sent his note and judicial card, Judge Pomrenke knew:
> - his wife had received a "target letter" four months earlier;
> - his wife had been indicted three weeks earlier;
> - in the interim between the "target letter" and indictment, other employees of BVU had been indicted, pleaded guilty, and were being sentenced based on evidence gathered from BVU through Bowman's assistance to the government;
> - Bowman was the [chief executive officer] and [p]resident of BVU and alone held the authority to fire his wife;
> - Bowman had been working closely with the federal investigators;
> - Bowman publicly had been asserting his open cooperation with the investigation in the media;
> - Bowman had been working with the Judge's wife at BVU to answer federal subpoenas on behalf of BVU; and
> - Bowman had granted the investigators office space, physically flanking his wife's office at BVU.

Judge Pomrenke violated Canon 2B by lending "the prestige of judicial office to advance the private interests of the judge or others." The note was intended to make his wife's employment secure. Bowman was the only person who could fire his wife. The note also reflected an intent to influence a potential witness by suggesting that Bowman "would agree [Mrs. Pomrenke] is absolutely honest, truthful, ethical, and innocent."

Judge Pomrenke's voicemail message for Moffatt was even more overt in its intent to influence a witness. Its first sentence states unequivocally that he was aware that she was to be a witness at his wife's trial. He then specifically asked Moffatt to "slip in" remarks that would be favorable to his wife, "even though it's not directly in response to the questions."

10

Judge Pomrenke argues that, given the context from which his actions arose, censure is the appropriate sanction. We note that the record before us contains several letters from attorneys who have written in support of Judge Pomrenke's professional reputation and service to his community. We have reviewed those submissions as part of our consideration of the proper disposition of this case.

This case differs in many significant respects from appellate matters before the Court. It comes to us because of a Complaint filed in this Court by the Commission. In this case, we do not sit in an appellate capacity. We sit in a disciplinary role entrusted to the highest court of the Commonwealth by the Constitution of Virginia. Apart from impeachment, only the Supreme Court of Virginia may remove a judge from office during the judge's term.

Having determined that Judge Pomrenke violated the Canons, we must decide the appropriate sanction. In addition to evaluating the nature and severity of violations of the Canons, we must consider the confidence of the public in the administration of justice. We must consider the confidence of coordinate branches of government that we will properly carry out our constitutional responsibilities. And we must consider the confidence of the over 400 judges who serve the Commonwealth. While factors such as stressful family circumstances may enter the decision-making matrix, such factors are of lesser significance than the confidence of the public, the confidence of the executive and legislative branches, and the confidence of all of the judges in the Commonwealth that we are capable of appropriately responding to the gravamen of the offenses involved.

We agree that:

> The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judiciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be designed to announce

11

> publicly our recognition that there has been misconduct; it must be sufficient to deter [the judge] from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future. Thus, we discipline a judge not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We discipline a judge to reassure the citizens of [this state] that the judiciary of their state is dedicated to the principle that ours is a government of laws and not of men.

*In re Dean*, 717 A.2d 176, 187 (Conn. 1998) (quoting *In re Zoarski*, 632 A.2d 1114, 1122 (Conn. 1993)) (internal quotation marks omitted).

What Judge Pomrenke did strikes at the heart of the judicial system. It is particularly damaging to the integrity of the judicial process and the confidence of the citizens of the Commonwealth that a sitting judge in the Commonwealth would attempt to improperly influence two potential witnesses in his wife's federal criminal trial. That his transgressions may not have actually affected the criminal trial of his wife does not mitigate the gravity of his conduct. We must focus upon the "offense" to the system of justice and the particular violations of the Canons of Judicial Conduct that apply to all judges. For our decision in this case, whether his conduct actually affected a pending criminal trial is not the issue. The question before us is whether Judge Pomrenke's conduct affects public confidence in the judiciary, the confidence of coordinate branches of government, the reputation of the judiciary, and the expectations of our fellow judges. Our conclusion is that it does.

We cannot escape the conclusion that having a sitting judge who apparently attempted to manipulate trial testimony would tend to impair public confidence in the integrity and impartiality of not only that judge, but also that of all the other members of the judiciary, and our entire system of justice. While the Court takes cognizance of Judge Pomrenke's family

12

circumstances, such considerations cannot outweigh the extraordinary harm that will be done to the judiciary if he remains on the bench.

The ultimate responsibility (apart from impeachment) for judicial discipline lies squarely with us. As for the coordinate branches of government, we expect the legislative and executive branches to do their duty. When it comes to disciplining judges, they expect the same of us.

We conclude that Judge Pomrenke's actions are of sufficient gravity to warrant removal. We will order that Kurt J. Pomrenke be removed immediately from the office of Judge of the Twenty-Eighth Juvenile and Domestic Relations Judicial District, pursuant to Article VI, § 10, of the Constitution of Virginia.

*Removal ordered.*