PUBLISHED

## VIRGINIA:

*In the Court of Appeals of Virginia on*   **Tuesday**   *the*   **10th**   *day of*   **March, 2020**.

Nathaniel Dennis,                                                                                           Petitioner,

 against              Record No.  0774-17-1

Commonwealth of Virginia,                                                               Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Chief Judge Decker, Judges Humphreys and O'Brien

Andrew George (Noah Mink; Elisa Beneze; Shawn Armbrust; Baker Botts L.L.P.; Mid-Atlantic Innocence Project, on briefs), for petitioner.

Alphonso Simon, Jr., Assistant Attorney General (Mark R. Herring, Attorney General, on brief), for respondent.

Nathaniel Dennis ("Dennis") petitions this Court for a Writ of Actual Innocence pursuant to Chapter 19.3 of Title 19.2 of the Code of Virginia.  Dennis was convicted in the Circuit Court of the City of Newport News ("circuit court") on May 20, 1998, of aggravated malicious wounding, attempted murder, and using a firearm in the commission of a felony.

## I.  BACKGROUND

On the night of October 8, 1997, Lynwood Harrison ("Harrison"), a supervisor at the Daily Press newspaper, was working alone in his office at the Daily Press facility in Newport News, Virginia.  This building was kept locked at night, except for a side door near Harrison's office, which he unlocked later that night for contractors who arrived in order to update their computers before picking up newspapers for delivery.

At about 11:45 p.m., the cleaning crew, which Dennis supervised, began cleaning the building.  Harrison did not see or interact with the cleaning crew, but he heard the "normal sound" of their cleaning cart moving across the floor.  After twenty or thirty minutes, Harrison heard the cleaning crew leave the building

and lock the side door behind them. Dennis parted company with the other members of the cleaning crew immediately thereafter.

A few minutes before 12:30 a.m., Harrison unlocked the side door to allow the contractors to enter. Shortly thereafter, Harrison noticed someone standing at "the doorway coming from the front part of the building." Harrison testified that he was "certain" the intruder did not enter through the unlocked side door because that door "makes a noise" and the intruder did not come from that direction.

Harrison thought he might recognize the person but was unsure. He testified that as he "started to say something," the intruder advanced toward him holding a metal pipe in the air. Harrison tried to retreat, but the intruder hit him in the face with the pipe. The intruder struck him in the arm as they "wrestled out into the hallway," where he knocked out one of Harrison's teeth. At that point, Harrison asked the intruder "why was he doing this?" The intruder responded by drawing a gun and saying, "If you resist any more, I will kill you." He then forced Harrison to the front of the building, where he instructed him to lie down. Even though Harrison complied, the intruder struck him again, then stated, "[s]tay here and you might just live through this" before walking toward Harrison's office. Once the intruder walked away, Harrison saw "the lights dim in the hallway" and "heard a couple of doors opening and closing."

The intruder returned four or five minutes later. The intruder retrieved a key from his own pocket, used it to unlock a set of double doors, and placed the pipe outside the door. He asked Harrison where the keys to the truck parked outside were located, and Harrison replied that they were on the desk in his office. The intruder quickly went to Harrison's office and returned, then grabbed Harrison off the floor and put him against a counter while pointing the gun at him.

Contractor Jerry Oxenburg arrived around 12:45 a.m. and noticed that the lights were out in the building, which was unusual. When Oxenburg stuck his head in the unlocked side door to ask "where somebody was," he noticed a male figure "ducking out of sight." Harrison heard Oxenburg call, "Is anyone here? Is anyone here?" Harrison did not respond because the intruder had the gun pointed at his face. As soon as Oxenburg left, the intruder shot Harrison in the face three times from a distance of about a foot.

-2-

Harrison managed to escape through the double doors the intruder had unlocked. Once outside, Harrison noticed the pipe laying by the door, then continued to the side of the building calling out for Oxenburg. Meanwhile, Oxenburg had gone to his car to retrieve his own gun because he "knew something wasn't right." Oxenburg returned to the side entrance of the building where he saw a tall figure with a gun pointed at him. Oxenburg retreated toward the front of the building and found Harrison crawling on the ground. Oxenburg called the police.

When police arrived, they found that Harrison's office had been "turned upside down." Harrison told police that he had approximately $393 in his office, which was never found, and a bag of coins that contained approximately $1,200. The bag of coins was recovered from behind the door of Harrison's office by an evidence technician while processing the scene.

Harrison's initial description of his attacker was a tall male, approximately 6'2", dark skin, shaven, wearing dark clothes, dark pants, a wide belt, and a knit cap. Although Harrison did not know his attacker, he told police that he could "re-identify" him and help develop a composite drawing. A police detective saw Dennis at the Daily Press building and noted that Dennis matched the description given by Harrison of his attacker. Harrison later picked Dennis's picture from a six-picture photo array, indicating that he had "no doubt" that the picture he selected depicted "the person that attacked [him] that night." Harrison also positively identified Dennis at trial as his attacker.

Dennis testified in his own defense and denied robbing or assaulting Harrison. A jury convicted Dennis on all charges.

On May 18, 2017, Dennis filed a petition for a writ of actual innocence based upon non-biological evidence. As part of his petition, Dennis provided this Court with six affidavits in support of his petition, to demonstrate that another person committed these offenses. This Court ordered the Attorney General to respond to the petition, and by order dated October 31, 2017, this Court found that Dennis was not entitled to relief and dismissed the petition.

On February 21, 2019, the Supreme Court of Virginia reversed and remanded the judgment of this Court, finding that it was an abuse of discretion to dismiss the petition without ordering the circuit court to conduct an evidentiary hearing for further development of the facts. Pursuant to the directive of the Supreme Court of Virginia, on June 6, 2019, this Court remanded the case to the circuit court in order to take the testimony of five witnesses and make relevant factual findings regarding their testimony.

On June 6, 2019, this Court directed that the circuit court take the testimony of five witnesses, who had provided affidavits to this Court as a part of the original petition, to determine whether another person confessed to shooting Harrison at the Daily Press. Specifically, we directed the circuit court to provide this Court with a transcript of the testimony and factual findings on whether Abdul Al-Musawwir ("Al-Musawwir") confessed to (1) Koneta Walker, (2) Andre Wiggins, (3) George Holley, (4) Andre Terry, and (5) Donald Poindexter that he assaulted and shot Harrison at the Daily Press on October 9, 1997.[1] The circuit court discovered that Terry was deceased and therefore could not take his testimony. This Court also directed the circuit court to provide us with its findings regarding each person's "apparent sincerity, conscientiousness, intelligence, and demeanor" as relevant to assessing the truthfulness of each witness's testimony.

## A. Testimony of Koneta Walker

On August 28, 2019, Walker testified that she used to date Al-Musawwir but ended the relationship around the spring of 1997 when she "found out the type of person that he was." She dated Al-Musawwir for a year or two sometime in the mid to late 1990s, around 1997. Walker testified that at that time, Al-Musawwir worked at the newspaper company, the Daily Press. Walker was not sure what type of work Al-Musawwir did at the Daily Press, but she remembered that Al-Musawwir would work late at night. Walker often used Al-Musawwir's yellow Oldsmobile, and she would take him to work and pick him up from work. Walker testified that she knew of a robbery that happened at the Daily Press while Al-Musawwir

---

[1] We did not direct that the testimony of affiant Harry Cutchin be taken because he died prior to our remand.

worked there. Walker also testified that she "know[s]" Al-Musawwir was involved since he called her to pick him up one night and, although she was unable to remember the date, that she assumes it was the night of the Harrison's assault based upon hearsay from others.

Walker testified that late one night, Al-Musawwir called Walker saying, "come as fast as you can." Walker asked what was wrong, but all Al-Musawwir said was, "just come on and pick me up," so Walker went to pick him up. Al-Musawwir called Walker a little bit earlier than the time he would normally get off work. When Walker arrived, Al-Musawwir ran to the car. Al-Musawwir looked "disheveled" like "something was wrong." His clothes had "blood spatters," and he had "a bag of coins, that he threw in the car." The coins were in a cloth bag, the size of a Crown Royal bag. Walker did not see any weapons. Al-Musawwir was also sweating. Upon seeing him, Walker asked Al-Musawwir what was wrong, and he responded that he "had to fuck someone up." Al-Musawwir asked Walker to get out of the car so that he could drive and did so.

Al-Musawwir drove very fast. Walker knew something happened based on Al-Musawwir's behavior and how much he wanted to get away from the Daily Press. She found out later what had happened based on "people talking about" how Al-Musawwir "had shot and killed someone and said that he had beat another man," but she never heard about the Daily Press attack in the news. Al-Musawwir dropped off Walker at their home and left shortly afterwards.

Although Walker could not remember the date or month of the incident, she believed it to be summertime because neither she nor Al-Musawwir wore a coat. Walker lived with Al-Musawwir at the time of the Daily Press incident but moved out "[b]ecause he was dangerous." Al-Musawwir was unhappy when Walker ended the relationship. However, he would still let Walker use his car after the breakup. After the relationship ended, Walker thought that she and Al-Musawwir were "cordial" until she found out that he was planning to kill her that Easter. Al-Musawwir shot Walker during Easter of 1998. Al-Musawwir "had plenty of guns." Walker testified that Al-Musawwir shot her on the left side of her head. Because of her injury,

Walker has difficulty remembering and states "things backwards." However, Walker testified that although she cannot remember dates, the injury did not affect her memory of the incident at the Daily Press.

Overall, the circuit court found Walker credible. The circuit court determined that Walker "holds a built-in bias against Al-Musawwir" because he shot her in the head, and she feared him. The circuit court also pointed out inconsistencies in Walker's affidavits, which although signed five years apart, both of Walker's affidavits state her age as 53 years old. However, the circuit court noted the specific details that Walker was able to recall, like the car's color and Al-Musawwir's physical state. The circuit court described Walker's testimony as a "logical narrative."

Despite some concerns, the circuit court found that the "testimony seemed truthful and intelligible." It described Walker as "thoughtful in her responses" and noted that she took time to think about questions before answering them. The court also related that Walker "seemed emotional" at first, but "remained calm and composed throughout the proceeding."

The circuit court stated that Walker "mentioned that she later heard [Al-Musawwir] may have shot and beaten someone with a pipe but never heard it from him." The circuit court believed that Walker observed "some event that took place at the Daily Press building in 1997. Koneta Walker likely saw the ending of an altercation at the Daily Press building, possibly witnessing the get-away of the attack on Lynwood Harrison."

### B.  Testimony of Andre Wiggins

Wiggins was incarcerated with Al-Musawwir at Hampton Roads Regional Jail in 1998 for "quite a few weeks" but "way less than a year." Wiggins was housed in the same cell block as Al-Musawwir but was not cellmates with Al-Musawwir. In his testimony before the circuit court, Wiggins stated that he was familiar with the attack on Harrison at the Daily Press. When asked if Al-Musawwir talked to him about the attack at the Daily Press while Al-Musawwir and Wiggins were incarcerated together, Wiggins responded that "he didn't directly talk to me."

-6-

Wiggins testified that Holley and Al-Musawwir were both Muslims. Holley was the "Iman" and "ran the Muslims" until Al-Musawwir took over, since Al-Musawwir knew more about the religion. A rivalry developed between Holley and Al-Musawwir, but Holley feared Al-Musawwir. Holley then "came out with" a letter stating that "Mr. Dennis wasn't the one." Wiggins did not know who wrote the letter but stated that Holley had the letter. Counsel again asked Wiggins whether he ever heard Al-Musawwir discussing what happened at the Daily Press while the two were incarcerated together. Wiggins responded that there was a "heated argument" among incarcerated persons when he heard Al-Musawwir state, "Well, you better check my record. I done already been down for such and such a long time for killing somebody." Wiggins testified that Holley asked Al-Musawwir, "Oh, you did kill somebody?" Al-Musawwir responded affirmatively.

The circuit court asked whether Al-Musawwir ever stated that he was involved in the specific incident at the Daily Press. Wiggins responded that Al-Musawwir did not state that he was "directly involved." However, Wiggins did have information about a girl who was with Al-Musawwir and that Al-Musawwir worked at the Daily Press. He heard this information from Holley and read it in the letter. At a different point in his testimony, Wiggins stated that Al-Musawwir did state that he worked at the Daily Press at night.

The circuit court, concerned about hearsay, asked Wiggins what Al-Musawwir directly told Wiggins. Wiggins responded that he heard Al-Musawwir state that Al-Musawwir killed someone, and to "check [his] state sheet." However, Wiggins also stated that Al-Musawwir indicated that he got away with the crime. Wiggins could not state who Al-Musawwir killed. Although Wiggins did not remember whether Al-Musawwir said anything about what type of weapon he used, Wiggins did remember "something about a pipe."

Wiggins later testified that Al-Musawwir stated that Dennis got caught for the crime Al-Musawwir committed. Wiggins testified that Holley told Wiggins about Dennis and said, "I'm going to help my friend." Wiggins had never met anyone named Koneta Walker, nor had he met Dennis.

Overall, the circuit court did not find Wiggins credible. The court stated, "The only consistent statement throughout Mr. Wiggins' testimony is Al-Musawwir mentioned he killed a guy during a heated

-7-

exchange with other inmates. Mr. Wiggins firmly stated once that Al-Musawwir said 'he got away with it.'" The circuit court expressed concern that Al-Musawwir may have been trying to "aggrandize himself" to Wiggins and Holley. The circuit court also expressed concern that Wiggins was "confusing facts learned from interacting with George Holley." The circuit court found that Wiggins's testimony lacked sufficient facts "to suggest he heard a confession of any sort regarding the attack at the Daily Press from Al-Musawwir." The circuit court pointed out that Wiggins testified twice that Al-Musawwir did not directly tell him about the attack at the Daily Press.

The circuit court observed that Wiggins appeared to be happy to be testifying in the case and "his mannerisms and body language seemed as if he was playing a part in a movie." Wiggins did not seem to take the proceedings seriously, like other witnesses did. The circuit court found, "Given the limited amount of information provided in his testimony and his demeanor, the [c]ourt views that the testimony of Andre Wiggins is not credible."

### C. Testimony of George Holley

On August 19, 2019, Holley testified before the circuit court that he was familiar with the attack on Harrison at the Daily Press. Holley does not know anyone named Koneta Walker. Holley does know Poindexter and had discussed the case with Poindexter. Holley also knows Dennis. Holley met Dennis sometime between 1998 and 1999 when Holley was incarcerated at the Hampton Roads Regional Jail in Portsmouth. Holley met Dennis when Dennis would come talk to Holley's cell partner; this occurred before Al-Musawwir arrived at Hampton Roads Regional Jail.

Holley and Dennis started talking while playing Spades together. Dennis told Holley that Dennis was incarcerated for a "crime of passion" because he and Harrison were involved with the same woman. Holley has not spoken to Dennis since Dennis left the jail sometime in 1999. About a month after Dennis was transferred to the Department of Corrections, Al-Musawwir came to the jail.

Holley was incarcerated with Al-Musawwir for more than five months between 1998 and 1999. Al-Musawwir discussed the Daily Press attack with Holley and two other cell partners. Holley did not know

-8-

how the conversation came up, but he stated that when it did, Al-Musawwir "started talking and he started telling about the crime, and that's when he said that somebody else was incarcerated for it."

Later, when Holley's cell partner was gone, Al-Musawwir came into Holley's cell and had an "in-depth conversation about it." As practicing Muslims, Holley and Al-Musawwir used to pray together, which is why they were also having a conversation. First, Holley and Al-Musawwir talked about robberies and "how to get away with robberies," since Holley was incarcerated for multiple robberies. In response, Al-Musawwir once again brought up the incident at the Daily Press. Holley testified that Al-Musawwir admitted to committing the crime and taking money out of a safe. Al-Musawwir did not say how he got into the safe, but said that he stole $12,000.

Holley testified that Al-Musawwir performed "night custodial work" for the Daily Press and by nature of his job, he knew that money was kept in a safe. Al-Musawwir told Holley that Al-Musawwir was hired through a temp agency to perform the custodial work at night. Al-Musawwir stated that he shot a man in the head and beat him with a pipe. He hid the pipe in a Dempsey dumpster near the Daily Press building before leaving. Al-Musawwir did not say where the attack occurred in the building, but he did state that it happened in the man's office. Al-Musawwir did not say whether the person he attacked was killed or what he did with the gun.

Al-Musawwir left by getting in a car that came around from the back. After Al-Musawwir left, he went to a motel on Jefferson Avenue or Warwick Boulevard with "some lady." Al-Musawwir and the lady, whom Al-Musawwir referred to as his girlfriend, smoked crack in the motel. However, the lady wanted to call the police to report the crime Al-Musawwir committed at the Daily Press because Al-Musawwir would not give her more money for crack. Eventually, Al-Musawwir shot her in the head, resulting in his incarceration. Holley and Al-Musawwir talked about the Daily Press incident approximately twice.

After hearing about the attack, Holley approached Wiggins and Terry and told them about the conversation with Al-Musawwir. Holley wrote a letter about what he had heard but did not let Wiggins or Terry read the letter. Holley wrote the letter to law enforcement because he thought Dennis was innocent.

-9-

Holley did not show the letter to anyone before he sent it to the Commonwealth. While Holley was mistakenly transferred to another facility, Wiggins told Al-Musawwir what Holley had done. After Holley returned, Terry warned Holley that Wiggins had told on him and that Holley's life was in danger. Then, a detective came to meet with Holley and ensured that Holley was moved out of Al-Musawwir's cell block. Holley had been approached by law enforcement about the situation approximately four to six times.

The circuit court found both Holley and Walker's testimony credible. However, Walker and Holley's testimony conflicted on whether Walker used drugs and the reasons for which Al-Musawwir shot Walker. The circuit court found that Al-Musawwir "could have been embellishing" by stating that Walker used drugs. The circuit court also found that Al-Musawwir could have also embellished by stating that he killed the woman he was with the night of the shooting. The circuit court believed that Al-Musawwir shot Walker because she broke up with him, not because she would tell the police about the robbery at the Daily Press, as alleged by Holley.

The circuit court described Holley's testimony as "revealing." It stated that the testimony, "[i]f true . . . would clearly demonstrate that Al-Musawwir confessed to committing the attack at the Daily Press as opposed to [Dennis]." The circuit court noted the consistency between Holley's testimony and the attack on Harrison.

The circuit court stated that Holley "seemed sincere," "presented a logical and tight narrative[,] and did not embellish facts when given the opportunity." Holley's responses were "careful and thought-out." The court also noted that Holley "did not seem eager" to testify and was concerned for his safety. The circuit court found that Holley's demeanor was consistent with the belief that Al-Musawwir committed the attack at the Daily Press, and found Holley's testimony to be credible.

### D. Testimony of Donald Poindexter

Poindexter is an inmate who was incarcerated with Al-Musawwir at Hampton Roads Regional Jail. He shared a cell with Al-Musawwir in 1998. Eventually, he shared a cell with Terry, as well.

On August 6, 2019, Poindexter testified before the circuit court that Al-Musawwir told him about a robbery, in which Al-Musawwir was involved, that occurred at the Daily Press newspaper. Poindexter testified that Al-Musawwir was trying to steal money kept in a supervisor's office because he needed a drug fix. Poindexter related that Al-Musawwir was able to get into the office because he used to work at the Daily Press at the time of the robbery as a janitor. Based on his employment, Al-Musawwir could tell when a supervisor would be there, how to hide his identity from cameras, and how to break into the "cage" where the money was kept. Al-Musawwir also had keys to "certain places" because he worked there.

Poindexter related that in order to get into the office in which the money was kept, Al-Musawwir "forced the door open," but did not explain how. However, Poindexter later clarified that he could have been mixing up the door to the supervisor's office and the "cage" where the money was kept. He stated that Al-Musawwir used keys to open the supervisor's office door and forced open the "cage" where the money was kept. Al-Musawwir had access to the hallway by nature of his job as a janitor but got the keys to the supervisor's office when the supervisor "stumbled upon him" in the hallway. Al-Musawwir then assaulted the supervisor and took a second set of keys to get into the supervisor's office. At a different point in Poindexter's testimony, he stated that while Al-Musawwir was stealing the money, the supervisor "came upon him" and Al-Musawwir "assaulted the man with a pipe."

Al-Musawwir told Poindexter that the man eventually died from his injuries. Al-Musawwir told Poindexter that he hid the pipe in the bushes outside. Al-Musawwir escaped because the woman whom Al-Musawwir later "ended up murdering" picked him up and drove him away. He later killed her "[t]o cover his tracks." Poindexter never met this woman and did not know her name. Poindexter did not know anyone named Koneta Walker.

Poindexter stated that Al-Musawwir got away with the money and was never charged for the robbery. Al-Musawwir stated that he took currency, mostly in the form of coins.

Poindexter stated that he and Al-Musawwir discussed the incident "a few times, about five or six times" because Al-Musawwir was trying to show that his crime was "more vicious" than the bank robbery for

-11-

which Poindexter was incarcerated. The topic originally came up because Al-Musawwir was "just talking about a crime," stating that someone got away with murder. After a while, Al-Musawwir began to trust Poindexter and "things started slipping out." Eventually, Al-Musawwir revealed that he was the person who did it. When asked whether the discussion between Poindexter and Al-Musawwir was about a murder, Poindexter responded that it was "[a]bout the robbery at the Daily Press."

Poindexter has met Dennis but does not know him well. Poindexter met Dennis at Wallens Ridge State Prison in early 2000, after Poindexter shared a cell with Al-Musawwir. Poindexter and Dennis shared a cell together for at least a month. Dennis told Poindexter about being incarcerated for a murder he did not commit. Dennis told Poindexter the details, and Poindexter told Dennis that he "knew he didn't do it." Dennis did not tell Poindexter where the incident for which he was incarcerated occurred. However, when Dennis mentioned certain evidence, Poindexter "knew what case it was." Poindexter did not tell Dennis about his conversation with Al-Musawwir. Even though Poindexter knew that Dennis and Al-Musawwir may have been talking about the same situation, Poindexter did not tell anyone about the conversations.

The circuit court found Poindexter credible and found that Poindexter's testimony establishes that Al-Musawwir confessed to attacking "someone" at the Daily Press. However, the circuit court noted inconsistencies in the details of Poindexter's testimony. The circuit court also noted that Poindexter did not state that a gun had been used. The circuit court found that the testimony "on a broader level" was credible. It was consistent with Holley's testimony because both described Al-Musawwir abandoning the pipe before leaving. The testimony was also consistent with Walker's testimony that she did not see Al-Musawwir with a weapon when she picked him up. The circuit court stated that the testimony "describes an assault on an individual inside the Daily Press with a pipe and a girl driving him away."

The circuit court found no incentive for Poindexter to testify against Al-Musawwir because there was no evidence of any rivalry or resentment. Poindexter also did not meet Dennis until after he met Al-Musawwir.

## II.  PETITION FOR A WRIT OF ACTUAL INNOCENCE[2]

Dennis's claim of innocence rests on newly discovered evidence about Al-Musawwir, who was a Daily Press truck driver at the time of the attack on Harrison.  Dennis points this Court to the similarities between Al-Musawwir's physical characteristics and Harrison's description of his attacker.  He also relies on the statements of Walker, Wiggins, Holley, Poindexter, Terry, and Cutchin.[3]

### ANALYSIS

"In deciding petitions for writs of actual innocence, the Court of Appeals acts as a court of original jurisdiction."  Conley v. Commonwealth, 284 Va. 691, 694 (2012) (citing Haas v. Commonwealth, 283 Va. 284, 292 (2012)).  In order to obtain a writ of actual innocence based on non-biological evidence, the petitioner has the burden to prove eight statutory elements, including that "the previously unknown or unavailable evidence is material, and when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt."  Code § 19.2-327.11; see also Code § 19.2-327.13 ("The burden of proof in a proceeding brought pursuant to this chapter shall be upon the convicted or delinquent person seeking relief.").  This Court can only issue the writ of actual innocence if the petitioner proves, by "clear and convincing evidence[,] all of the allegations contained in clauses (iv) through (viii) of subsection A of § 19.2-327.11" and if this Court finds that "no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt."  Code § 19.2-327.13.  Thus, we first focus on the materiality requirement of Code § 19.2-327.11(A)(vii).

---

[2] Although it has no bearing on our analysis, any decision here will not affect Dennis's custody status since, as the Attorney General points out on brief, he is currently incarcerated in Alabama where he was convicted of a 1981 capital murder and burglary and sentenced to life imprisonment without the possibility of parole on August 9, 2019.  Ken Curtis, *Judge Wanted to Give Convicted Cold Case Killer Death but Didn't*, WTVY (Aug.  9, 2019, 10:50 AM), https://www.wtvy.com/content/news/Judge-wanted-to-give-convicted-cold-case-k-iller-death-but-didnt-530330551.html.

[3] Because Terry and Cutchin are now deceased and could not provide testimony before the circuit court, we do not consider their earlier statements here.

"[T]o be 'material,' within the meaning of Code § 19.2-327.11(A)(vii), evidence supporting a petition for a writ of actual innocence based on non-biological evidence must be true." Dennis v. Commonwealth, 297 Va. 104, 124 (2019) (quoting Carpitcher v. Commonwealth, 273 Va. 335, 345 (2007)). False evidence "cannot be 'material' under the terms of the statute." Carpitcher, 273 Va. at 345. "Additionally, '[e]vidence that relates to a matter that is properly at issue in the case is said to be material.'" Bush v. Commonwealth, 68 Va. App. 797, 806 (2018) (alteration in original) (quoting Turner v. Commonwealth, 282 Va. 227, 250–51 (2011)). Further, any evidence we consider in connection with a petition for a writ of actual innocence must also be admissible and unequivocal to satisfy the clear and convincing evidentiary standard. Cf. Carpitcher, 273 Va. at 345 ("The statutes governing writs of actual innocence based on non-biological evidence considered as a whole . . . were not intended to provide relief to individuals who merely produce evidence contrary to the evidence presented at their criminal trial.").

### A. Testimony of Koneta Walker

Dennis has failed to show by clear and convincing evidence that Walker's testimony is material. Although Walker observed Al-Musawwir after some sort of altercation when she picked him up from work, it would be pure speculation to find that the altercation was the October 9, 1997 attack on Harrison. First, Walker could not remember the date on which she picked up Al-Musawwir from the Daily Press. Second, Walker did not observe any weapons on Al-Musawwir, despite the fact that the person who perpetrated the attack on Harrison had shot Harrison in the face three times. Third, the only admission that Al-Musawwir made directly to Walker was that he "had to fuck somebody up," and he had a bag of coins in his possession. This vague statement can hardly be considered a confession to having attacked Harrison, and the trial evidence established that although a bag of coins was present in Harrison's office on the night of his attack, it was not taken. Instead, Walker's belief that Al-Musawwir committed the attack stems from her having heard "people talking about" Al-Musawwir having "shot and killed someone and . . . beat another man." These hearsay rumors, combined with what the circuit court described as her "built-in bias against Al-Musawwir" because he shot her in the head, do not unambiguously establish through admissible evidence the allegation

-14-

that Al-Musawwir committed the offenses at the Daily Press instead of Dennis. Further, the circuit court's statement that Walker saw the end of an altercation at the Daily Press at best presents only the possibility that it was the attack on Harrison. Accordingly, we hold that Walker's testimony is not material. See id. at 346.

### B. Testimony of Andre Wiggins

The circuit court found that the entirety of Wiggins's testimony was not credible. Because the record supports this conclusion, we do not consider it material and give no weight to it in our evaluation of the petition.

### C. Testimony of George Holley

The circuit court provided little guidance for our determination of the materiality of Holley's testimony. The circuit court found Wiggins not to be credible, yet in its credibility findings for Holley, specifically referenced Wiggins's testimony that Holley feared Al-Musawwir. Further, the circuit court found, "*If true*, the facts would clearly demonstrate that Al-Musawwir confessed to committing the attack at the Daily Press as opposed to Petitioner." The circuit court found Holley credible but did not make any similar finding regarding Al-Musawwir's statements to Holley. From this we conclude that the circuit court found that Al-Musawwir confessed to committing the specific attack on Harrison, but the circuit court was not convinced that Al-Musawwir was being truthful in his confession to Holley. Nevertheless, based upon the circuit court's findings, we conclude that the materiality requirement is satisfied with respect to Holley's testimony. However, for the reasons stated below, that does not end the analysis.

### D. Testimony of Donald Poindexter

The circuit court found that Poindexter's testimony was credible "on a broader level." It concluded only that Al-Musawwir confessed to beating "someone" with a pipe at the Daily Press and to stealing money and is thus material to that limited extent. Again, however, that does not end our analysis.

## E. Totality of the Evidence Review[4]

Because the circuit court did not find Wiggins credible and because we conclude that Walker's testimony, while credible, is insufficiently detailed to be material to the issue of whether it was Al-Musawwir rather than Dennis who assaulted Harrison, we consider only the statements Al-Musawwir made to Holley and Poindexter in the remainder of our analysis.

We now examine the totality of the material evidence from Holley and Poindexter along with the evidence produced at trial to determine whether Dennis has met his burden under Code § 19.2-327.13. "Code § 19.2-327.13 requires the Court to 'examine the "probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial."'" Knight v. Commonwealth, 71 Va. App. 492, 519 (2020) (quoting Bush, 68 Va. App. at 808). "[T]he newly-supplemented evidentiary record 'is reviewed in its totality,' and we evaluate its probative force 'under the clear-and-convincing standard.'" Id. (quoting In re Brown, 295 Va. 202, 229 (2018)). Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." Brown, 295 Va. at 227 (quoting Judicial Inquiry & Review Comm'n of Va. v. Pomrenke, 294 Va. 401, 409 (2017)). This standard of proof is more than a preponderance of the evidence, and "has been fairly characterized as a 'heavy burden.'" Id. (first quoting Pomrenke, 294 Va. at 409; then quoting Commonwealth v. Allen, 269 Va. 262, 275 (2005); and then quoting United States v. Watson, 793 F.3d 416, 420 (4th Cir. 2015)). In determining whether the petitioner is entitled to a writ of actual innocence under this standard, we "draw our conclusion from a hypothetical new trial in which a rational factfinder hears all of the evidence in the aggregate." Id. at 229 (quoting In re Watford, 295 Va. 114, 125 (2018)). "It is not enough for a petitioner to merely establish the existence of some conflicting evidence that introduces the possibility of reasonable doubt." Watford, 295 Va. at 124. "[A] petitioner's evidence must do more than establish the theoretical possibility that a rational fact finder would choose to acquit; it must establish such a high

---

[4] Because we determined that Walker's testimony is not material, we do not address it in the context of this analysis.

probability of acquittal, that this Court is reasonably certain that no rational fact finder would have found him guilty." Id.

Although Holley and Poindexter provided material testimony to the extent that Al-Musawwir made statements to them that he attacked somebody at the Daily Press, in considering whether their testimony is sufficiently clear and convincing that, if presented at trial, no reasonable jury would have convicted Dennis, a reasonable jury would, and here clearly did, give considerable weight to Harrison's eyewitness testimony, including his positive identification of Dennis as "the person I saw that night." Harrison continually identified Dennis and confirmed that Dennis was the right person throughout the investigation in 2000. Conversely, for the following reasons, we conclude that the testimony from Holley and Poindexter would be given less weight by a jury.

While characterizing both Holley and Poindexter as generally "credible," the circuit court was careful to qualify that characterization. Similarly, any jury would likely note the significant inconsistencies between Al-Musawwir's statements to Holley and Poindexter and the unchallenged details of the assault from the trial record.

It is true that Al-Musawwir's statements to both Holley and Poindexter contain some details consistent with the testimony received at trial. However, in considering the weight to give Al-Musawwir's statements, we note, and Dennis concedes, that this case generated extensive publicity in the newspaper where the crime occurred and in other local media. Thus, in weighing them, we cannot conclude that Al-Musawwir's statements to Holley and Poindexter contain details of the crimes of which only the actual perpetrator would likely be aware.

Moreover, both Holley's and Poindexter's testimony contain multiple inconsistencies with the evidence presented by each other and by other witnesses at trial. Holley and Poindexter both describe Al-Musawwir as a custodian, when Al-Musawwir worked as a truck driver at the time of the attack, and it was actually Dennis who worked at the Daily Press as part of the custodial crew. Holley stated that while he was incarcerated with Al-Musawwir, Al-Musawwir discussed the attack at the Daily Press. Holley stated that

Al-Musawwir "started talking and he started telling about the crime, and that's when he said that somebody else was incarcerated for it." Consistent with trial testimony, Holley testified that Al-Musawwir stated that he shot a man in the head and beat him with a pipe. However, he also stated that Al-Musawwir hid the pipe in a dumpster near the Daily Press building before leaving. According to the trial evidence, Harrison testified that the perpetrator put the pipe outside the door to the Daily Press building, not in a dumpster. Holley also stated that Al-Musawwir confessed to committing the crime and stealing $12,000 from a safe. No evidence was presented at trial about either a safe or $12,000 being missing.

Similarly, Poindexter is inconsistent in stating when and where Al-Musawwir stated that he encountered Harrison. At one point in his testimony, Poindexter stated that Al-Musawwir said Harrison found Al-Musawwir in the supervisor's office while Al-Musawwir was stealing money. At another point in Poindexter's testimony, Poindexter stated that the supervisor stumbled upon him in the hallway, which is how Al-Musawwir got the keys to break into the office. The trial evidence was that Harrison's assailant already possessed a set of keys used to unlock Harrison's office but demanded from Harrison the keys to a truck parked outside. It is more reasonable to infer that Dennis, the supervisor of the custodial crew, would have keys to unlock the various doors at the Daily Press than Al-Musawwir, a truck driver. Poindexter also refers to the incident at certain times as a robbery, and at other times as a murder, although no murder occurred. Consistent with the trial evidence, Poindexter mentions the assault was with a pipe, but significantly, he does not mention any use of a gun. Poindexter stated that Al-Musawwir hid the pipe in the bushes outside, while Harrison and the investigators stated that the pipe was placed outside the door. Not only is Poindexter's description of the placement of the pipe inconsistent with Harrison's testimony, it is also inconsistent with Holley's testimony.

Missing from the testimony of both Holley and Poindexter are vital details such as the date of the incident or any statements from Al-Musawwir sufficient to clearly identify Harrison as Al-Musawwir's victim. This vagueness is also evident in the circuit court's finding that Al-Musawwir confessed to attacking "someone." Given the inconsistencies and lack of detail in the statements made to Holley and Poindexter and

weighing them against the trial record, we conclude that the evidence from Holley and Poindexter regarding statements Al-Musawwir made to them do not satisfy the clear and convincing standard newly discovered evidence must meet. At best, their testimony establishes no more than "the possibility of reasonable doubt," which is insufficient as a matter of law to satisfy Dennis's statutory burden.

### III. CONCLUSION

For all of these reasons, we conclude that Dennis has failed to establish by clear and convincing evidence that if Al-Musawwir's statements to Holley and Poindexter had been known and introduced at the time of his trial, a reasonable jury would not find Dennis guilty beyond a reasonable doubt. See generally Code § 19.2-327.13. Accordingly, we hold that Dennis is not entitled to a writ of actual innocence and dismiss his petition.

_____

Humphreys, J., concurring.

I join entirely with the analysis and judgment of my colleagues in this case. I write separately only to highlight some aspects of our Supreme Court's opinion in Dennis, 297 Va. 104, that, in my view, have sown some confusion in the law with respect to the way this Court analyzes these petitions in the hope that the Supreme Court will eventually clarify any ambiguity.

In Dennis, our Supreme Court noted at some length that "[a]ppellate courts do not engage in factual evaluation" and the reasons why. Id. at 124. While that is certainly true, the problem is that this statement overlooks the fact that in evaluating petitions for writs of actual innocence involving non-biological evidence, this Court is not sitting as an appellate court. Instead, we are the Court of original jurisdiction in these cases, and as our Supreme Court at least acknowledges in Dennis, the petition for a non-biological writ of actual innocence is "one of the rare situations in which the General Assembly has charged an appellate court with engaging in factual evaluation." Id. at 127.

The petitioner argues on brief that the Supreme Court's emphasis on appellate court deference to the factfinding role of the circuit court in Dennis suggests that a remand for factfinding by a circuit court requires

that we basically rubber-stamp that court's findings such that if the circuit court finds witnesses credible, a writ must necessarily issue.

I concede that the petitioner may have a point that an inference can arguably be drawn from the Supreme Court's lengthy discourse in Dennis regarding the factfinding deficiencies inherent in the role of an appellate court such that any factfinding by the circuit court is conclusively determinative of our ultimate decision of whether a writ should issue. While I reject such an inference, if I am mistaken and such implication was our Supreme Court's intent, I respectfully disagree. I conclude that such a construction would be clearly erroneous since it conflicts with the expressed intent of Code § 19.2-327.13 that this Court is the tribunal that must weigh such evidence against the original trial record.

In my view, the statutory scheme contemplates that the role of the circuit courts is to assist this Court in our factfinding function—not to supplant it. I agree with my colleagues here that, based upon a close observation of a witness while testifying, a circuit court may determine whether some or all of a witness's testimony is truthful; nevertheless and although a factfinding function, the ultimate weight to be given credible testimony against the totality of other evidence produced at trial is properly the province of this Court, rather than the circuit court, and is not subject to *de novo* appellate review.

This is necessarily so since in some cases, certainly including this one, we are presented with the peculiar situation where two different factfinders—a unanimous jury on one hand and a circuit court judge who was not involved in the original trial and did not make similar observations of the trial witnesses on the other—have assigned credibility to the testimony of witnesses who point fingers in different directions regarding the identity of the perpetrator of the offense(s).

This of course is a situation that could never arise at trial where a single factfinder determines both overall credibility of *all* the witnesses and the weight each piece of evidence merits and perhaps is the best reason why the procedure we are engaging in here is a very poor substitute for a trial. Nevertheless, it is this Court's statutory burden and not that of the circuit court, or for that matter our Supreme Court, to determine

whether the weight of the newly discovered material and admissible non-biological evidence is clear and convincing enough to overcome the very strong presumption that the original verdict was correct.

_____

This order shall be published.

A Copy,

Teste:

*original order signed by the Clerk of the Court of Appeals of Virginia at the direction of the Court*

Clerk