# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Wednesday** *the* **6th** *day of* **November, 2024**.

Jorge Guevara-Martinez,                                                  Appellant,

against          Record No. 1848-22-4
                   Circuit Court Nos. CJ22001017 and CJ22001018

Alexandria Department of Community and Human Services,                      Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Decker, Judges Beales, Huff, AtLee, Malveaux, Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins, White and Frucci

On October 15, 2024, the appellee, by counsel, filed a petition requesting that the Court set aside the judgment rendered on October 1, 2024, and grant a rehearing en banc on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the Court grants the petition for rehearing en banc and reinstates the appeal of those issues on the docket. The Court stays the mandate previously entered in this case pending the Court's en banc decision.

The parties must file briefs in compliance with the schedule set forth in Rule 5A:35(b).

A Copy,

Teste:

A. John Vollino, Clerk

By:     *original order signed by a deputy clerk of the*
        *Court of Appeals of Virginia at the direction*
        *of the Court*

Deputy Clerk

Present:   Judges Athey, Causey and Callins
Argued at Winchester, Virginia

JORGE GUEVARA-MARTINEZ

MEMORANDUM OPINION[*] BY
v.       Record No. 1848-22-4       JUDGE DORIS HENDERSON CAUSEY
OCTOBER 1, 2024

ALEXANDRIA DEPARTMENT OF
 COMMUNITY AND HUMAN SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Lisa B. Kemler, Judge

James C. Martin (Martin & Martin Law Firm, on briefs), for
appellant.

Helen T. Clemens (Joanna C. Anderson; Meghan S. Roberts; Office
of the City Attorney, on brief), for appellee.

No brief or argument from the guardian ad litem for the minor
child.[1]


Jorge Guevara-Martinez (father) appeals the circuit court's orders, entered on November 14,

2022, terminating his parental rights to his son and approving the foster care goal of adoption.

Father argues that the circuit court erred by terminating his parental rights and approving a foster

care goal of adoption "where the child had been illegally abducted from another country, thus

depriving the court of legitimate subject matter jurisdiction."  Father further contends that the circuit

court violated his due process rights when the City of Alexandria Department of Community and

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] On June 8, 2023, and June 27, 2023, the Clerk's office notified Luis Chinchilla, the
minor child's guardian ad litem, that the Court had not received a brief or letter stating which
party he supported.  *See* Rule 5A:19(d).  Although the Court requested a response within 14
days, the guardian ad litem never responded to the Court's correspondence.

Human Services (the Department) failed to present clear and convincing evidence that he was an "unfit" parent. Father also asserts that "delays caused by the abduction, the pandemic, [his] refusal to enter the United States illegally, and the appeals in this case . . . cannot be used to conclude that the child's need for finality requires termination" of his parental rights. Finally, father argues that the circuit court erred by terminating his parental rights and approving the foster care goal of adoption "where the Interstate Compact for the Placement of Children is being circumvented by efforts to divert placement to an illegal alien."

BACKGROUND[2]

Father and Martiza Ulloa Turcios (mother) are the biological parents to the child who is the subject of this appeal.[3] The family lived together in Honduras until July 2019, when mother and the then-five-year-old child left father because of what mother described as "constant physical and psychological abuse." Mother and child eventually came to the United States.[4] In October 2019, the Department received reports alleging abuse and neglect by mother and concerns about her mental health. While father told the Department that mother took the child without his permission, mother told the Department that she came to the United States because father had been physically, verbally, and emotionally abusive towards her. Despite the decline of mother's mental health, she

---

[2] "On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)). The record in this case was sealed. "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022). We unseal only the facts mentioned in this opinion; the rest of the record remains sealed. *Id.*

[3] On October 28, 2021, mother signed a permanent entrustment agreement, which the City of Alexandria Juvenile and Domestic Relations District Court approved.

[4] Mother met a man online, moved to Virginia (U. S.), married him, and began living with him and his three children in the City of Alexandria from July 2019 to September 2019. Mother was asked to leave the home by her husband for "displaying verbal abuse, yelling, and name calling."

refused services and told the Department that she did not need a mental health assessment. The Department and mother entered into a safety plan in which mother was not to be left alone with the child; one of mother's friends agreed to be the child's caretaker.[5] When mother's mental health continued to decline, the Department sought a protective order for the child.

On October 30, 2019, the City of Alexandria Juvenile and Domestic Relations District Court (the JDR court) entered a child protective order and temporary order awarding mother's friend sole legal and physical custody of the child. The JDR court subsequently adjudicated that the child was abused or neglected, finding that he was "without parental care . . . caused by the unreasonable absence or the mental or physical incapacity of the child's parent." Later, the JDR court entered a dispositional order. The JDR court's records reflect that father was not present at the initial JDR court hearings, though he was represented by court-appointed counsel.

In February 2020, mother's friend told the Department that she needed to travel to El Salvador to care for an ill relative; the friend signed a temporary entrustment agreement, and the child entered foster care. Two months later, mother's friend returned to the United States and indicated that she could no longer care for the child. The Department petitioned for emergency removal, which the JDR court granted. The Department had determined that father was not a placement option at that time because of mother's allegations that father had been abusive towards her. Thus, the child remained in foster care, and the JDR court again adjudicated that the child was abused or neglected.

After the child entered foster care, the Department established requirements that father[6] had to complete before he could be reunited with the child. The Department asked father to

---

[5] Mother's friend was a neighbor who obtained legal residency in January 2020. The record is void of mother's husband being considered as a placement option.

[6] Father is Spanish-speaking.

participate in family partnership meetings and monthly treatment team meetings. The Department also required father to maintain contact with the child and participate in parent coaching services. In addition, father had to cooperate with a home study.

Although father did not travel from Honduras to the United States because of the COVID-19 pandemic and his lack of a passport or a visa, he participated virtually in family partnership meetings and several treatment team meetings and indicated that he wanted the child returned to his care. Father's participation in meetings did involve "some inconsistencies." Sometimes, father "listen[ed] in and ask[ed] questions," but at other times, he did "not show up," had "challenges with his [internet] connection," or was not in "a quiet environment."

Shortly after the child entered foster care, the Department attempted to "complete a home study with International Social Services," but due to the COVID-19 pandemic, Honduras was under a "complete lock-down and home studies [were] not being completed until restrictions [were] lifted." Several months later, on August 6, 2020, the Directorate for Children, Youth, and Family (DINAF) completed a home study for father in Honduras. DINAF interviewed several of father's relatives, including his parents and older children. All recommended that the child remain in the United States and not return to father in Honduras. Accordingly, DINAF did not recommend placing the child with father because his family described him as "an irresponsible and aggressive person who engaged in domestic violence against" mother.

The Department referred father to parent coaching and parent support services in a "rural city" approximately 45 minutes away (one-way) from his home, but father stated that he would not participate in the services due to the distance and unreliable bus transportation. The Department then arranged for father to participate virtually in parent coaching through the Multicultural Clinical Center, which also supervised his virtual visits. Father "consistently" participated in phone and video calls with the child, although the Department was concerned that the conversations caused the

child "distress" because father "often" discussed the child's return to Honduras. The Department found that father required "assistance with appropriately engaging with [the child] and maintaining a positive relationship with him."

While the Department offered some services to father, it also explored other relative placement options. A paternal uncle and aunt in Texas expressed interest in serving as the child's caregivers. The Department arranged for the child to have weekly contact with these relatives, along with one of his older brothers who had been living with the relatives. The Department also arranged for the child to visit these relatives in Texas. In addition, the child's relatives travelled to Virginia at least twice to visit him. The Department sought a home study of the paternal uncle and aunt's home through the Interstate Compact on the Placement of Children (ICPC). Texas Social Services found that the child's relatives would not be approved as "a relative foster home" because the paternal uncle was not a legal resident or United States citizen. The Department could not place the child with the Texas relatives without ICPC approval. Thus, the Department sought to change the goal of foster care to adoption.

The Department did not recommend placing the child with father because of his "history of aggression and domestic violence" and failure to address the Department's concerns. In October 2021, the Department petitioned to terminate father's parental rights and recommended a foster care goal of adoption/relative placement. Father asked for a continuance so that he could appear in person at the hearing; however, his motion was denied. Father participated in the JDR court termination hearing by telephone while represented by counsel. The JDR court terminated father's parental rights and approved the foster care goal of adoption. Father appealed the JDR court's rulings.

On November 14, 2022, the parties appeared before the circuit court; surprisingly, father was present in person, having received a visa a few days before the hearing. The Department

presented evidence that the child, who was eight years old and healthy, was "responding really well in his foster home." Initially, the child only spoke Spanish, but as of the circuit court hearing, he spoke English "fluently" and was "doing really well in school." Since entering foster care, the child's mental health had improved, and he was "actively engaging in therapy to address the traumas that he had endured."

Father and his family wanted the child with family. Acknowledging that father had repeatedly stated that he wanted the child returned to him, the Department remained concerned about father caring for the child because of the "ongoing reports of his abusive history" and father's lack of understanding of the child's needs. For example, during visits, father needed "constant" reminders to ask the child questions, engage with him, and have "child-appropriate conversations" with him.

The Department also presented evidence from C.G., one of father's older sons. Before moving to the United States, C.G. had lived with father, mother, the child, and his other brother in Honduras. While they lived together, C.G. "[f]requently" witnessed father physically and verbally abusing mother. According to C.G., father hit mother and insulted her, sometimes in front of the child. After the child reported to the paternal grandparents that father had hit mother, father made the child, who was two years old at the time, kneel for "about ten minutes."[7] C.G. also testified that father hit him with a belt and with a rope, which father denied.

After the Department rested, father moved to strike; the circuit court denied father's motion. Father testified that mother and C.G. left Honduras in 2017 and moved to Mexico. He denied abusing mother and said that they had an "excellent" relationship before she "abandoned the home." Father, the child, and another of father's sons remained in Honduras. Seven months after she left, mother returned to Honduras and stayed until the summer of 2019, when she "took

---

[7] Father denied hitting mother and punishing the child.

the child" out of school without telling father. Two days later, father reported the incident to DINAF. According to father, he did not know where the child was until mother's friend contacted him months later to request that he "sign something" so that she could "have the child"; father refused. When the Department contacted father, he stated that he had filed "a report with immigration to have [the child] returned to Honduras" and asked the Department to return the child to him. Father testified that the last time he saw the child was "[a]bout three years ago."

Father described himself as an "[e]xemplary father" to the child. Father testified that he and the child played ball together and bathed in the river. They went to the store and a local restaurant together. When father "had time," he took the child to school and picked him up. Father also took the child to medical appointments and the hospital because sometimes the child got a fever and "just collapse[d]." Father reiterated that he wanted to take the child home to Honduras, but if he could not do so, he was willing to "seek political asylum in this country." Most notably, father was the child's primary caretaker just prior to the child being taken from Honduras to the United States.[8]

After hearing all the evidence and arguments, the circuit court found that the evidence was sufficient to terminate father's parental rights under Code § 16.1-283(C)(2) and approve the foster care goal of adoption and relative placement. The circuit court acknowledged father's efforts to file a complaint with DINAF for the return of the child and his efforts to come to the United States for the termination hearing. The circuit court also recognized father's efforts to engage in fun activities with the child, take him to medical appointments, and provide for the family financially. Yet the circuit court found it "equally compelling" that "not one person," including his parents and his older children, thought that father was "fit to care" for the child. The circuit court credited C.G.'s

---

[8] Mother lived in Mexico for seven months. Father remained in the home with their two sons. Upon mother's return, she lived in father's parents' house until 2019 when she took the child to the United States.

testimony describing father's "physical violence" and "completely inappropriate" punishment of the child. The circuit court also found that father waited until "the last possible moment to actually make [a] serious effort to come [to Virginia] to address the situation in person" and questioned whether he was just "going through the motions." The circuit court held that it was in the child's best interests to terminate father's parental rights. Father appeals.

## ANALYSIS

"On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 699 (2022) (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

## I. Jurisdiction

For the first time on appeal, father challenges the circuit court's jurisdiction. In his opening brief, father states that "this case is *apparently* covered by the Hague Convention on the Civil Aspects of International Child Abduction." (Emphasis added). He also contends that the circuit court "*seems* to have had no subject matter jurisdiction to terminate [his] parental rights." (Emphasis added). "Subject matter jurisdiction defines a court's 'power to adjudicate a case,'" *Hannah v. Commonwealth*, 303 Va. 106, 123 (2024), and to do so "upon the merits and dispose of it as justice may require," *Pure Presbyterian Church of Washington v. Grace of God Presbyterian Church*, 296 Va. 42, 49 (2018) (quoting *Shelton v. Sydnor*, 126 Va. 625, 629

- 8 -

(1920)).  "[F]or a court to have the authority to adjudicate a particular case upon the merits," it must possess subject matter jurisdiction.  *Id.*

"Whether the record establishes subject matter jurisdiction in a particular case is a question of law reviewed de novo on appeal."  *Ruderman v. Pritchard*, 76 Va. App. 295, 302 (2022).  "[T]he lack of subject matter jurisdiction can be raised at any time in the proceedings, even for the first time on appeal by the court *sua sponte*."  *Holden v. Commonwealth*, 26 Va. App. 403, 407 (1998) (quoting *Morrison v. Bestler*, 239 Va. 166, 170 (1990)).  "'Jurisdiction of the subject matter can only be acquired by virtue of the Constitution or of some statute,' and it 'refers to a court's power to adjudicate a class of cases or controversies.'"  *Cilwa v. Commonwealth*, 298 Va. 259, 266 (2019) (first quoting *Pure Presbyterian Church*, 296 Va. at 56; and then quoting *In re Commonwealth*, 278 Va. 1, 11 (2009)).  "The Constitution of Virginia vests courts with the 'judicial power' to adjudicate classes of cases and controversies determined by the General Assembly."  *Id.* at 267 (quoting Va. Const. art. 6, § 1).

A circuit court has jurisdiction to consider the termination of a parent's parental rights under Code § 16.1-283.  *See Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 327 (2013) ("Virginia JDR and circuit courts have subject matter jurisdiction to determine the custody, control, or disposition of a child within its jurisdiction alleged to be abused or neglected or where the termination of residual parental rights is sought."); *see also* Code §§ 16.1-241(A), -244.

Father's challenge to the circuit court's jurisdiction rests on his contention that the case may fall within the parameters of the Hague Convention.  The United States is a contracting party of the Hague Convention, which "was adopted in 1980 in response to the problem of international child abductions during domestic disputes."  *Golan v. Saada*, 596 U.S. 666, 670 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)).  "Congress implemented the Convention in the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, as amended, 22 U.S.C. § 9001 *et seq.*"  *Id.* at

671. "Under ICARA, state and federal district courts have concurrent original jurisdiction of actions arising under the Convention." *Coe v. Coe*, 66 Va. App. 457, 473 (2016) (citing 22 U.S.C. § 9003(a)). "Any person seeking the return of a child pursuant to the Convention may commence a civil action by filing a petition in a court where the child is located." *Id.* (citing 22 U.S.C. § 9003(b)). The provisions of ICARA are not self-executing. "The petitioner bears the burden of showing by a preponderance of the evidence that the removal or retention was wrongful under [Hague Convention] Article 3; the respondent must show by clear and convincing evidence that one of Article 13's exceptions applies to prevent the return." *Id.* (citing 22 U.S.C. § 9003(e)(1)(A), (2)(A)); *see also Golan*, 596 U.S. at 671-72 (noting that father filed a petition under ICARA). Father has not filed a petition under ICARA seeking the return of the child, so the Convention is not implicated in this case.[9]

Father has not filed a petition seeking the return of the child, nor has he addressed his burden of proving that the child's "removal or retention was wrongful" under the Hague Convention.[10] *Coe*, 66 Va. App. at 473. Notwithstanding this, even if a petition were to be filed, our courts would have concurrent original jurisdiction of this controversy. *See id.* Thus, the circuit court would continue to have jurisdiction over this matter.[11] Therefore, father's argument is

---

[9] Moreover, even when the Convention is implicated, the circuit courts of this Commonwealth have subject matter jurisdiction to consider a properly filed petition. *See* 22 U.S.C. §§ 9002(8), 9003(a); *Coe*, 66 Va. App. at 473.

[10] In his reply brief, father contends that filing a petition was "discretionary," but he does not address his burden of proving by "a preponderance of the evidence that the removal or retention was wrongful under Article 3." *Coe*, 66 Va. App. at 473.

[11] ICARA provides that "any court exercising jurisdiction of an action brought under section 9003(b) of this title may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition." 22 U.S.C.A. § 9004(a). Thus, even if the Hague Convention were implicated as father asserts, and even if he filed a petition accordingly, the court's concurrent jurisdiction over that claim would not preclude it from exercising its jurisdiction under Virginia Code § 16.1-283. The termination of parental

- 10 -

unpersuasive, and we find that the circuit court had subject matter jurisdiction under Code § 16.1-283.

## II. Due Process and Termination of Parental Rights

Father argues that the circuit court violated his due process rights by terminating his parental rights because there was not clear and convincing evidence that he was an "unfit" parent. He argues that the evidence was insufficient to justify such a termination. We agree.

"The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'" *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). "These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." *Id.* "The parent-child relationship 'is a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment.'" *Lively v. Smith*, 72 Va. App. 429, 441 (2020) (quoting *L.F. v. Breit*, 285 Va. 163, 182 (2013)).

"It is undisputed that parents have a fundamental liberty interest in the companionship, care, custody, and management of their children." *In re B*, 756 N.W.2d 234, 241 (Mich. Ct. App. 2008) (citing *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982)). "[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky*, 455 U.S. at 760. "This fundamental liberty interest pertains to citizens and aliens alike because 'the Due Process Clause applies to all "persons" within the United

---

rights pursuant to Code § 16.1-283 is done in accordance with the "best interests of the child," and thus falls within the scope of 22 U.S.C.A. § 9004(a).

States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.'" *In re B*, 756 N.W.2d at 241 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

"The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself." *Weaver v. Roanoke Dep't of Human Res.*, 220 Va. 921, 926 (1980). "While it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare." *Id.* This Court has held that "[t]he termination of parental rights is a grave, drastic, and irreversible action. When a court orders termination of parental rights, the ties between the parent and child are severed forever and the parent becomes a 'legal stranger to the child.'" *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986) (quoting *Lowe v. Richmond Dep't of Pub. Welfare*, 231 Va. 277, 280 (1986)).

"Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship." *Weaver*, 220 Va. at 926. The circuit court terminated father's parental rights under Code § 16.1-283(C)(2), which authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

"Code § 16.1-283 permits complete termination of parental rights only if 'clear and convincing evidence' demonstrates that parental unfitness cannot be remedied within a reasonable period of time." *Wright v. Alexandria Div. of Soc. Servs.*, 16 Va. App. 821, 829 (1993). "The term 'clear and convincing evidence' has been defined as 'that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *Judicial Inquiry & Review Comm'n of Va. v. Pomrenke*, 294 Va. 401, 409 (2017) (quoting *Judicial Inquiry & Review Comm'n of Va. v. Waymack*, 284 Va. 527, 534 (2012)). This standard is considerably higher than a "mere preponderance," *id.*, and has been fairly characterized as a "heavy burden." *Commonwealth v. Allen*, 269 Va. 262, 275 (2005); *United States v. Watson*, 793 F.3d 416, 420 (4th Cir. 2015). "Such a standard cannot be met with evidence that leaves 'competing inferences "equally probable."'" *In re Brown*, 295 Va. 202, 227 (2018) (quoting *Edmonds v. Edmonds*, 290 Va. 10, 22 (2015)).

Moreover, under Code § 16.1-283 "[t]he evidence must show that 'reasonable and appropriate efforts' were made by social agencies to remedy the conditions leading to foster care by less severe means of intervention and through rehabilitative services." *Wright*, 16 Va. App. at 829-30 (quoting *Weaver*, 220 Va. at 928). "Only after the failure of those efforts to remedy the conditions leading to foster care may the state sever the parental rights." *Id.* at 830.

Here, we hold that the circuit court prematurely terminated father's parental rights. The record before us contains no "demonstrated failure of [father] to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms*, 46 Va. App. at 271). The Department established several requirements for father to complete before he could be reunited with his child. For example, father had to comply with a home study, which he did. Father also had to attend parent coaching services, which the Department then arranged for father to receive through the same agency that supervised his visits with the child. Although father could not travel to the United States because of the

COVID-19 pandemic and his lack of a visa or passport, he clearly indicated that he wanted his child returned to his care. He filed a complaint with DINAF once he learned that his son did not come home from his kindergarten class and he discovered that his son had been abducted.[12] Father participated virtually in family partnership meetings and several treatment team meetings required by the Department. Finally, the Department also required father to maintain contact with the child. Father consistently participated in phone and video calls with the child, although the Department was concerned that the conversations caused the child "distress" because father "often" discussed the child's return to Honduras.

The Department put on evidence that it provided father in-person parenting classes, which he either refused or was unable to avail himself of, then made a virtual parenting class available to father. The Department presented no evidence nor made any allegations that he failed to participate in this virtual class. The Department presented evidence that father failed to adjust his communication style with the child during virtual visits to one they deemed more appropriate. The social worker testified that father received instruction about how to communicate with the child during their virtual visitation, but father by and large did not respond to this instruction. Though the Department presented evidence of an initial home study that recommended not placing the child with father, there was no testimony of any follow-up evaluation after father had participated in the virtual parenting class. Father testified about his desire to be in his child's life and that he had taken several steps to remedy the Department's concerns.

---

[12] Father testified that he went to work as normal, and the child went to his kindergarten class. Mother took the child out of his kindergarten class, which father discovered when he returned home from work and mother and child were gone. Subsequently, father reached out to DINAF to file a complaint.

Even in the face of a global pandemic, the record demonstrates that father complied with the demands of the Department. Father has continuously contended that mother took their child without his permission and that he desires to be reunited with his son. Moreover, father did nothing to cause the child to be in the custody of the Department. Father participated in the JDR court termination hearing by telephone after the JDR court denied his motion for continuance so that he could appear in person. Father participated in the virtual parenting classes and complied with the home study. Father even traveled to the circuit court termination hearing five days early. However, no evidence shows that once father was in Virginia, services were offered to attempt to rehabilitate father. Thus, once he was in the United States, father was not afforded a meaningful opportunity to remedy the Department's concerns and rehabilitate himself.

The child was placed in foster care after a decline in mother's mental health. The child was initially placed with mother's friend, who could no longer care for the child. The Department determined that father was not a placement option at that time because of mother's allegations that father had been abusive toward *her*, not the child. The Department put on evidence from father's son, C.G., who testified that he "[f]requently" witnessed father physically and verbally abusing mother and that father made the child, who was two years old at the time, kneel for "about ten minutes."[13] This testimony at most established that father had been abusive towards the child's mother and had physically disciplined, perhaps excessively, his children. This evidence went to the initial need for the child to be in foster care. It established the conditions that the Department had determined needed improving before father became a suitable placement for the child. By its nature therefor, it did not have any bearing on whether father had remedied these conditions. Based on the record, father no longer has a relationship with mother. Mother's parental rights have been terminated. Thus, the "conditions leading to foster care" have arguably been

---

[13] Father denied hitting mother and punishing the child.

remedied. There is no mention of other additional conditions that father must remedy nor is there any support in the record that father was responsible for the incidents that led to the child being placed in foster care. Furthermore, to the extent that any other conditions have not been remedied, the Department has failed to take "reasonable and appropriate efforts" to help father remedy them.

Thus, the only evidence before the circuit court that father had not remedied the situation requiring the child's continued foster care placement was the Department's opinion that father had not sufficiently modified how he participated in virtual visits with the child. This is not clear and convincing evidence that the father failed to remedy the situation requiring the child's continuation in foster care. Though the circuit court's finding "is entitled to great weight," here, it is "without evidence to support it." *Simms*, 74 Va. App. at 470 (quoting *Ridgeway*, 59 Va. App. at 190). The mere fact that father did not modify his communications with his son can hardly satisfy the heavy burden of showing by more than a mere preponderance that the parenting classes had not improved father's identified parenting deficiencies. Upon such thin evidence a fact finder could not be sure what type of impact the parenting classes had upon father, and thus there could be no "firm belief or conviction" that father had not remedied his identified parenting deficiencies. *Pomrenke*, 294 Va. at 409. Quite simply, there has been no "demonstrated failure of [father] to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms*, 46 Va. App. at 271).

Considering the totality of the record, "reasonable and appropriate efforts" were not made by the Department to remedy the conditions that led to the child being placed in foster care. Furthermore, the Department has failed to provide clear and convincing evidence that demonstrates that father's unfitness cannot be remedied within a reasonable period of time.

Thus, the circuit court prematurely terminated father's parental rights under Code § 16.1-283(C)(2) and erred in approving the foster care goal of adoption.[14]

CONCLUSION

Children who enter this country and are reported abducted must be afforded the opportunity to reunite with their parents and families once found.  Here, the parent-child relationship is a constitutionally protected right that extends beyond citizenship.  Thus, the circuit court erred by violating father's fundamental right to parenthood when the court terminated his parental rights.  Accordingly, the circuit court's judgment terminating father's parental rights and approving the foster care goal of adoption is reversed and remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

[14] Because "[w]e have an 'obligation to decide cases on the best and narrowest grounds available,'" we conclude that this holding under Code § 16.1-283(C)(2) is the best and narrowest ground for the resolution of this appeal.  *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) (quoting *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022)).  Therefore, we do not address his third and fourth assignments of error arguing that the circuit court erred in terminating his parental rights: (1) "where delays caused by the abduction, the pandemic, [his] refusal to enter the United States illegally, and the appeals in this case were not culpable acts" by him; and (2) because the ICPC is "being circumvented by efforts to divert placement to an illegal alien."

Athey, J., concurring.

I agree with the majority that the circuit court erred in terminating father's parental rights. However, I write separately to note that this agreement extends only to the majority's analysis that the Department failed to provide clear and convincing evidence that father failed to remedy his situation under Code § 16.1-283(C)(2). As this ground by itself is sufficient for reversal, I would not address father's remaining assignments of error as "[w]e have an 'obligation to decide cases on the best and narrowest grounds available,'" and resolving this matter under Code § 16.1-283(C)(2) is the best and narrowest ground for the resolution of this appeal. *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) (quoting *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022)).

Callins, J., concurring in part, and dissenting in part.

As an initial matter, father brings four assignments of error for appellate consideration. First, father contends that the circuit court was without "legitimate subject matter jurisdiction." But father's arguments addressing this issue turn on a flawed understanding of subject matter jurisdiction as well as the relevance of the Hague Convention and the mechanisms by which the Convention is enforced. I agree with my colleagues that father has failed to show that the circuit court was "depriv[ed]" of "legitimate subject matter jurisdiction."

Second, father contends that "there was no clear and convincing evidence" that he "was an unfit parent." I disagree. Code § 16.1-283(C)(2) requires that a circuit court consider the best interests of the child as well as other factors when terminating residual parental rights. But whether the evidence presented at the termination hearing regarding the child's best interests reached the "clear and convincing" threshold is not a determination that we, as an appellate court, can make sitting in review of the circuit court's judgment. Indeed, a circuit court, "[i]n its capacity as factfinder, . . . retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 266 (2005)). And here the circuit court's judgment regarding the child's best interests was based on evidence heard *ore tenus*. Hence, the *only* consideration before us is whether the circuit court's findings regarding the best interests of the child were plainly wrong or without evidence to support them. *See id.* ("The [circuit] court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991))). Because evidence was presented as to father's history of abuse and aggression on which the circuit court could rely in finding that termination of father's parental rights was in the best interests of the

child, the circuit court's findings were not plainly wrong or without evidence to support them. Thus, I would affirm the circuit court on this point. Moreover, as explained *infra*, father's arguments as to how the other factors delineated by Code § 16.1-283(C)(2) were applied to this case are waived under Rule 5A:20(e).

Third, father argues that the "delays caused by the abduction, the pandemic, [his] refusal to enter the United States illegally, and the appeals in this case were not culpable acts by [father] and cannot be used to conclude that the child's need for finality requires termination." But the arguments father presents on brief addressing this assignment of error are sufficiently vague— and skeletal—as to invite this Court "to research [and] construct" father's "arguments for him." *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (quoting *Sneed v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010)). This we cannot do. Accordingly, I would find that father's arguments fail to meet the requirements of Rule 5A:20(e) and are, therefore, waived.

Fourth, father argues that the "Interstate Compact for the Placement of Children [wa]s . . . circumvented by efforts to divert placement [of the child] to an illegal alien." To the extent that my colleagues in the majority find that this argument does not merit our consideration and since father's argument on this point fails to comport with the strictures of Rule 5A:20(e), I agree.

Among these four assignments of error are two about which my colleagues and I disagree. It is on these assignments of error that I focus in the analysis that follows.

## I. Father's Second Assignment of Error

Father contends, under his second assignment of error, that "there was no clear and convincing evidence [that he] was an unfit parent, thus violating his Due Process rights under the Fourteenth Amendment to the United States Constitution, Article I Section 11 of the Virginia

- 20 -

Constitution, and Section 16.1-283 of the Code of Virginia."[15] On brief, father argues, among other things, that "the evidence for this termination is insufficient as a matter of statutory law, and it must be reversed on that ground." Father asserts, "[t]he presumption favoring a natural parent has not been overcome," since "[t]here was no clear and convincing evidence that . . . father's parental rights to this child should be interfered with, much less terminated." Father argues that, instead, the evidence presented at the termination hearing constituted "unspecified and unadjudicated allegations of abuse by . . . father to the mother," one of which such allegations, father emphasizes, he "denied . . . under oath."

Father's arguments are unavailing. First, father's second assignment of error is lacking in precision.[16] As drafted, it asserts that "the [circuit] court erred in terminating [father's] parental

_____

[15] As our Supreme Court held in *Knox v. Lynchburg Division of Social Services*, 223 Va. 213 (1982), Code § 16.1-283(C)(2) passes constitutional muster. *Id.* at 223-24 (rejecting appellant's arguments that Code § 16.1-283 "is invalid because (1) it denies substantive due process by permitting termination in the absence of a compelling state interest, (2) it is unconstitutionally vague, and (3) it permits termination of parental rights on proof by a mere preponderance of evidence"). Rather, Code § 16.1-283(C)(2) delivers to parents the process they are due under the United States Constitution as well as the Virginia Constitution. *See Rader v. Montgomery Cnty. Dep't of Soc. Servs.*, 5 Va. App. 523, 526 (1988) ("The statutory scheme for the constitutionally valid termination of residual parental rights in this Commonwealth is primarily embodied in Code § 16.1-283."). Understanding this, father argues, on brief, that "[d]ue process requires a [circuit] court to strictly comply with the applicable statutory scheme for the disposition of child custody cases." *See id.* ("These procedures must be strictly followed before the courts are permitted to sever the natural and legal bond between parent and child.").

[16] What is more, father's second assignment of error appears not to have been preserved. Father includes in his opening brief page references for four locations in the record where the error outlined in this assignment was stated. Two of the four locations—father's motion to strike and father's closing argument—do not include arguments that track or reflect with specificity father's second assignment of error. The other two locations correspond with a pleading document titled "Appellant's Objections to Termination of Parental Rights and Permanency Planning Orders," dated December 1, 2022. The pleading was stamped as filed on December 2, 2022, more than two weeks after the circuit court entered the permanency planning order on November 14, 2022. Father's notice of appeal, stamped as filed December 5, 2022, was also signed by counsel on December 1, 2022.

Rule 5A:18 provides that "[n]o ruling of the [circuit] court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty *at the time of the ruling*." (Emphasis added). Here, father's objections were filed *weeks* after the ruling, almost

rights and in the accompanying permanency planning orders approving goals other than return home to him, where there was no clear and convincing evidence [father] was an *unfit* parent." (Emphasis added). But Code § 16.1-283(C) does not require that a circuit court make a finding as to a parent's fitness. And the circuit court did no such thing here. *See* Code § 16.1-283(C)(1)-(2) (providing that "[t]he residual parental rights of a parent" may be terminated where "the court finds, based upon clear and convincing evidence, that it is in the *best interests of the child*" and certain other conditions are met (emphasis added)).

Nevertheless, a circuit court's "determin[ation] that the factors listed in Code § 16.1-283(C)(2) existed" is "tantamount to a finding of parental unfitness," making "separate finding[s] of unfitness . . . [un]necessary." *Helen W. v. Fairfax Cnty. Dep't of Hum. Dev.*, 12 Va. App. 877, 885 (1992) (citing *Harris v. Lynchburg Div. of Soc. Servs.*, 223 Va. 235, 241 (1982)). Here, the court found that

> the Department has met its burden to establish by clear and convincing evidence that termination of your residual parental rights pursuant to Virginia Code Section 16.1-283(C), that the petition should be granted along with the petition for permanency planning order with the goal of adoption and relative placement.

Hence, because the circuit court found that the factors in Code § 16.1-283(C)(2) existed, and this finding was tantamount to a finding of parental unfitness, father's assignment of error, which asserts that "there was no clear and convincing evidence [father] was an unfit parent," can be

---

simultaneous with father's notice of appeal. Rule 5A:18 "afford[s] the trial judge an opportunity to rule intelligently on objections," "at a point in the proceeding when the [circuit] court is in a position . . . to consider the asserted error [and] rectify the effect of the asserted error." *Moison v. Commonwealth*, 302 Va. 417, 419 (2023) (first, third, and fourth alterations in original) (quoting *Maxwell v. Commonwealth*, 287 Va. 258, 264-65 (2014)). The referenced document afforded the circuit court no such opportunity. Moreover, father did not, between noting his objections and filing his notice of appeal, request a hearing on the objections or move for reconsideration.

construed as contending that the evidence was insufficient to support the circuit court's finding

regarding the subject factors.

The first such factor is the best interests of the child. *See* Code § 16.1-283(C)(2). The

circuit court observed,

> not one person who was interviewed who knows [father] the best, your parents, your children, your older children, and I think there were some others that were interviewed. Not one gave the opinion that you were fit to care for [the child], that you understood his or could provide for his developmental, his emotional, his educational, his medical needs. And in fact, the home study was replete with statements about the physical and verbal aggression exhibited by you.

The circuit court then further found that,

> while your son, [C.G.], as hard as it was to have to listen to his testimony, he didn't -- in my view, he was credible because I didn't see any exaggeration in this testimony. He only identified one episode of actually observing you be physically violent towards his mother.[17] But he also testified about having to experience and bear physical violence by you against him.
>
> And then he also described at least one inciden[t] of you punishing [the child] in what this Court would find a completely inappropriate way.

The circuit court could make the above-referenced evidence the basis for its finding that it was

not in the best interests of the child for father to retain his residual parental rights. And such

finding was neither plainly wrong nor without evidence to support it. Rather, the circuit court's

observations and finding were tightly moored to evidence in the record.

The Department of Social Services' foster care service plan review, which was included

in an exhibit introduced at the hearing, stated that the child's "grandparents do not recommend

his return to Honduras as they do not believe [father] is capable of parenting [the child] and

---

[17] According to the record, C.G. testified to a single instance where both C.G. and the child were present and witnessed father grab the mother by her neck and throw her on the sofa before slapping her.

providing for his emotional, educational, and medical needs." The review also stated that father's "parents and two children live together in a home separate from" father and that father's "children have reported that they do not have a good relationship with their father." One of father's children, C.G., testified at the termination hearing. C.G., who lived with father for 14 years, testified, among other things, that he observed "physical, and verbal aggression" by father "[f]requently," that father "would hit" mother, level "[i]nsults, words," and that the physical abuse happened in front of father's children. One incident, C.G. testified, happened in front of the child when he was two years old; after, the child reported the incident to his grandparents. In response, father "got angry" at the child and "made him kneel" for "about ten minutes." C.G. also testified that father was physically aggressive toward C.G.'s grandmother "the same time that he broke my mother's eyebrow." Although C.G. testified that father was not abusive toward him or his brothers, he responded "Yes" when asked, "did your father ever hit you?," and averred that father would hit him "[w]ith a belt . . . with rope." Similarly, the home study noted, "It is important to mention that what has been declared by [father] is not valid since the people who were interviewed have described [him] as an irresponsible and aggressive person who engaged in domestic violence against [mother]." Such people, the report continued, "established that [mother] has been the person responsible for the financial and emotional wellbeing of the boys."

Next, in finding that circumstances warrant the termination of the residual parental rights of a parent, a circuit court must also find that other conditions delineated under Code § 16.1-283(C)(2) are met. *See* Code § 16.1-283(C)(2) ("The parent . . . without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and

appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end."). Father seems to argue that such conditions were not met in this case. Specifically, father points out that "[t]he best interests of the child are NOT the only thing that must be proven under the statute," and later notes that the statute "deals with the remedying of conditions." Rather than explain how or why such conditions were not met here, father poses a rhetorical question, "But what were the conditions that needed to be remedied under Subsection 16.1-283(C)(2)?" Beyond posing this question, father supplies no further argument on this point, much less elucidates how or why the circuit court erred in its application of Code § 16.1-283(C)(2). Instead, father's question appears to invite this Court to make such arguments for him.[18] But the burden of argument is not for this Court to carry—it rests with father alone. Thus, I would find that father's argument regarding whether he had substantially remedied the conditions that led to the continuation of the child's foster care placement is waived. *See Bartley*, 67 Va. App. at 744 ("Rule 5A:20(e) requires that an appellant's opening brief contain '[t]he principles of law, the argument, and the authorities relating to each question presented.' Unsupported assertions of error 'do not merit appellate consideration.'" (alteration in original) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008))).

---

[18] Indeed, my colleagues in the majority appear to have accepted father's invitation, elaborating in detail the conditions father was to have met, and finding, ultimately, that "the only evidence before the circuit court that father had not remedied the situation requiring the child's continued foster care placement was the Department's opinion that father had not sufficiently modified how he participated in virtual visits with the child." On this basis, my colleagues find that "[t]his is not clear and convincing evidence that the father failed to remedy the situation requiring the child's continuation in foster care," that such finding is without evidence to support it, and that "[t]he mere fact that father did not modify his communications with his son can hardly satisfy the heavy burden of showing by more than a mere preponderance that the parenting classes had not improved father's identified parenting deficiencies." Yet, father makes none of these arguments. Moreover, although framed with reference to the correct standard, my colleagues appear to reweigh the evidence rather than consider whether *any* evidence supported the circuit court's finding.

- 25 -

Accordingly, I would find the arguments father marshals under his second assignment of error fail to establish that the circuit court committed reversible error. *See Stockdale v. Stockdale*, 33 Va. App. 179, 185 (2000) ("The burden is on the party who alleges reversible error to show that reversal is justified." (quoting *D'Agnese v. D'Agnese*, 22 Va. App. 147, 153 (1996))).

## II. Father's Third Assignment of Error

Father's third assignment of error asserts that "delays caused by the abduction, the pandemic, [father's] refusal to enter the United States illegally, and the appeals in this case were not culpable acts by [father] and cannot be used to conclude that the child's need for finality requires termination." In so asserting, father appears to contend that he had "good cause" to have been unable "to remedy substantially the conditions which led to or required continuation of the child's foster care placement." Code § 16.1-283(C)(2). However, this is not what father argues on brief. Instead, father simply states that "[s]ome degree of fault is relevant to all termination cases, but none was proven here." Although father does cite to two circuit court opinions to support this proposition, father fails to elaborate, with specificity or even in outline, the significance of this "fault" argument—or the noted delays—with specific reference to Code § 16.1-283(C)(2).

Instead, father's argument that "[s]ome degree of fault is relevant to all termination cases, but none was proven here," operates at a high level of generality and addresses none of the specific facts of this case. Such argument serves as an invitation to this Court to fill in the gaps, making this Court into "a depository in which" to "dump the burden of argument and research." *Fadness v. Fadness*, 52 Va. App. 833, 850 (2008) (quoting *Jones*, 51 Va. App. at 734). In other words, father's argument displaces the burden of research and argument to this Court, turning this Court into "an advocate for, as well as the judge of the correctness of, [appellant's] position

on the issues he raises." *Id.* (alteration in original) (quoting *Jones*, 51 Va. App. at 735). With father having made only a "skeletal argument," *Bartley*, 67 Va. App. at 746 (quoting *Sneed*, 301 S.W.3d at 615), thrusting this Court into the role of advocate for and judge of the positions he raises, I am compelled to find that the argument father makes under his third assignment of error is waived.

Even so, the arguments father raises across his four assignments of error raise issues that should not go unremarked. Not least among these issues is father's status as a non-citizen, non-resident; the seeming barriers, some apparently insuperable, that may have impinged on father's ability to remedy substantially the conditions that led to the child's continued foster case placement; the geography of economic privilege and how such privilege may inflect the record here; and, notably, the absence of adjudication under the Hague Convention. Each referenced issue is a cause for pause. But this Court may not push aside procedural defects, mis-calibrated arguments, or appellant-made errors in an effort to reach out and grab meritorious issues. Nor may this Court use its position to advocate for parties or make decisions on the basis of policy considerations. *Cf. Payne v. Payne*, 77 Va. App. 570, 589-90 (2023). Understanding this, I must respectfully dissent.